1   Neal A. Potischman (SBN 254862)
    Brooke Pyo (SBN 282326)
2   DAVIS POLK & WARDWELL LLP
    1600 El Camino Real
3   Menlo Park, California  94025
    Telephone: (650) 752-2000
4   Facsimile:  (650) 752-2111
    neal.potischman@davispolk.com
5   brooke.pyo@davispolk.com

6   Lawrence Portnoy
    (*pro hac vice application forthcoming*)
7   Julia Kiechel
    (*pro hac vice application forthcoming*)
8   DAVIS POLK & WARDWELL LLP
    450 Lexington Avenue
9   New York, New York 10017
    Telephone: (212) 450-4000
10  Facsimile:  (212) 701-5800
    lawrence.portnoy@davispolk.com
11  julia.kiechel@davispolk.com

12  *Attorneys for Plaintiffs Denis O'Brien and
    Digicel Group Ltd*

13

14              **UNITED STATES DISTRICT COURT**

15         **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

16  DENIS O'BRIEN and DIGICEL GROUP        CASE NO. SACV12 - 01965 JVS (ANx)
    LTD,
17
                 Plaintiffs,
18                                         **COMPLAINT (LIBEL, FALSE
         v.                                LIGHT, EXTORTION,
19                                         INTENTIONAL INTERFERENCE
    DONALD MACALLISTER,                    WITH PROSPECTIVE
20                                         ECONOMIC ADVANTAGE)**
                 Defendant.
21

22

23

24

    COMPLAINT

Plaintiffs Denis O'Brien and Digicel Group Ltd, for their complaint against Defendant Donald MacAllister, allege as follows:

## NATURE OF THE ACTION

1. This is an action for libel per se and libel, false light, intentional interference with prospective economic advantage and extortion, arising from an intentional and continuing series of falsehoods that Defendant Donald MacAllister knowingly and deliberately has made and continues to make in written statements to numerous third parties. The purpose and effect of this pattern of misconduct is to (a) expose Denis O'Brien to hatred, contempt, ridicule and disgrace, (b) threaten that unless Mr. O'Brien pays Mr. MacAllister millions of dollars, Mr. MacAllister will continue to attempt to wrongfully connect him to criminal conduct and/or expose him to disgrace or contempt, and (c) interfere with the prospective economic advantage to be gained by Mr. O'Brien and his company, Digicel.

## THE PARTIES

2. Plaintiff Denis O'Brien is a leading Irish entrepreneur and philanthropist. He has founded and led national and international communications companies, and is currently the Chairman and owner of Digicel. He is and has been a resident of Malta since 2006.

3. Plaintiff Digicel Group Ltd is a telecommunications company incorporated in Bermuda and with its principal place of business in Kingston, Jamaica. Digicel provides mobile services and other telecommunications services in 31 markets in the Caribbean and Central and South America to more than thirteen million wireless users. Its sister operation, Digicel Pacific Limited, operates in six markets in the South Pacific. Digicel is currently preparing to enter

a competitive tender process to seek a license to provide mobile telecom services to the people of Burma, a nation of 60 million people where less than two percent of the population is reported to have mobile phones. This mobile telecom license is a significant financial opportunity for Digicel.

4.     On information and belief, defendant Donald MacAllister is and has been at all relevant times a resident of Orange County, California.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332. Pursuant to 28 U.S.C. § 1332(a)(2), this is a dispute between "citizens of a State [Mr. MacAllister] and citizens or subjects of a foreign state [Mr. O'Brien]." Moreover, consistent with 28 U.S.C. § 1332(a), the amount in controversy is far in excess of $75,000. Defendant MacAllister is actively interfering with a billion-dollar business opportunity for Digicel. Moreover, Defendant MacAllister has actively sought through his extortionate demands millions of dollars from Mr. O'Brien, conduct that the suit seeks to enjoin.

6.     Venue is proper in this Court pursuant to 28 U.S.C § 1391(b)(1) because, on information and belief, defendant Donald MacAllister is and has been at all relevant times a resident of Orange County, California. Moreover, venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because false statements set forth in this Complaint, which damaged and are continuing to damage Plaintiffs O'Brien and Digicel, were made, on information and belief, from Orange County.

## FACTS COMMON TO ALL COUNTS

7.     Defendant MacAllister is a cousin of Mr. O'Brien. In August 1972, Mr. MacAllister's mother (a sister of Mr. O'Brien's father) was tragically killed in

2

1   a car accident with another passenger vehicle when Mr. MacAllister was nine years

2   old and when Mr. O'Brien was fourteen years old.  Mr. MacAllister has written

3   extensively about his tumultuous youth, experience with various foster families,

4   anger and other personal problems.  Mr. MacAllister has indicated that Mr.

5   O'Brien's family had always been kind and loving to him and his family, and tried

6   to adopt him after the aforementioned car accident.  Mr. MacAllister apparently

7   would have liked to live with the O'Brien family, but was disallowed from doing

8   so by Mr. MacAllister's own abusive father.

9       8.     Notwithstanding the foregoing, and although the fourteen year old Mr.

10  O'Brien was not present at or otherwise involved in the accident, Mr. MacAllister

11  in recent years has asserted that Mr. O'Brien and/or members of Mr. O'Brien's

12  immediate family failed to cooperate in the investigation of the accident and

13  improperly, in Mr. MacAllister's view, had subsequent business dealings with the

14  individual who drove the other vehicle.  Mr. MacAllister also has written

15  extensively about his personal anger and sense of betrayal at these business

16  dealings.

17      9.     Mr. O'Brien has established himself as a successful entrepreneur,

18  founding a mobile phone consortium and media holding company before launching

19  Digicel.

20      10.    Mr. O'Brien supports numerous charities, including the Haiti Action

21  Network, which coordinates the work of approximately 80 relief organizations in

22  Haiti; Concern Worldwide, Ireland's largest aid and humanitarian agency; and the

23  Special Olympics.  He is chairman and co-founder of Frontline, the international

24  foundation for the protection of human rights defenders.   He established the

3

COMPLAINT

O'Brien Foundation in 2000 to identify and assist projects in Ireland and abroad which aims to alleviate the effects of poverty in disadvantaged communities. In 2010, Mr. O'Brien was named goodwill ambassador for the city of Port-au-Prince in Haiti by the mayor, in recognition of his efforts to rebuild Haiti and attract foreign direct investment in the aftermath of the earthquake that year. Earlier this year, Mr. O'Brien was honored by the Clinton Global Initiative with a Clinton Global Citizen Award.

11.     Mr. O'Brien has also provided significant financial support and opportunity to his cousin, Mr. MacAllister and to Mr. MacAllister's siblings over an extended period. In 2002, well after the original round of Digicel financing, Mr. O'Brien permitted Mr. MacAllister to invest $100,000.00 into Digicel as a personal favor. As of Digicel's sale in 2007, Mr. MacAllister's investment had grown in value to nearly $1,500,000.00. Mr. MacAllister received the amount of $1,491,883.86 in March 2007 arising from the financial restructuring of Digicel.

12.     Notwithstanding this support, and the huge success of the Digicel investment Mr. O'Brien permitted Mr. MacAllister to make, Mr. MacAllister in recent years began to demand enormous sums of money from Mr. O'Brien. Once Mr. O'Brien rejected those demands, Mr. MacAllister began repeating them in ever more shrill and irrational terms, and embarked on a plan to attempt to damage Mr. O'Brien's reputation and Digicel's business, and to extort sums from Mr. O'Brien, all as set forth in greater detail below.

13.     In December 2009, Mr. MacAllister sought from Mr. O'Brien a twenty-year "loan" of $27,000,000.00, with the first two years interest free, the stated purpose of which was to allow Mr. MacAllister to fund a start-up self-

4

1   storage business.  In connection with the venture, Mr. MacAllister apparently

2   intended to pay himself a salary of at least $89,000.00 per year.

3        14.    In sending his proposal to Mr. O'Brien, Mr. MacAllister suggested

4   that the self-storage business would be a good opportunity for Mr. O'Brien to

5   diversify away from his telecom holdings.  In the cover letter to the proposal, Mr.

6   MacAllister stated that he "respect[ed] [Mr. O'Brien's] business accomplishments

7   over the years," and proposed 90-minute quarterly meetings between Mr. O'Brien

8   and Mr. MacAllister for the explicit purpose of allowing Mr. MacAllister to

9   receive Mr. O'Brien's "business mentorship and advice" on the self-storage

10   venture.

11        15.    In early 2010, Mr. O'Brien elected not to fund Mr. MacAllister's

12   business proposal.  It was after Mr. O'Brien turned away the request for the

13   $27,000,000.00 below-market "loan" that Mr. MacAllister begin his relentless

14   campaign of publicly spreading falsehoods about Mr. O'Brien while, at the same

15   time, making requests for money.  Mr. MacAllister went so far as to write and self-

16   publish a manuscript in 2011 regarding, among other things, the death of his

17   mother, which includes a litany of false accusations about "Billionaire Denis

18   O'Brien" and seeks more than €108,000,000.00 from him for the MacAllister

19   family.  In it, Mr. MacAllister alleges a far-reaching and "shocking" conspiracy to

20   cover up the true circumstances of his mother's death, all in order for the

21   individuals who tried to adopt him (i.e. the O'Brien family) to secure seed capital

22   from the other driver that their then fourteen-year-old son would later use to build

23   a business.

24

16.     Mr. MacAllister's demands for money from Mr. O'Brien did not stop with the request for the $27,000,000.00 below-market "loan" in 2010.  In particular, Mr. MacAllister brought suit in Bermuda against Mr. O'Brien and Digicel in August 2011, seeking the return with interest of a purported second investment of $100,000.00 that Mr. MacAllister claimed to have made in Digicel in 2003.  No such investment was ever made.  Mr. O'Brien is contesting the legal action in Bermuda.  Other than the initial filing of the lawsuit, Mr. MacAllister has not taken any steps to proceed with the Bermuda litigation, though as set forth below, he has repeatedly requested that Mr. O'Brien pay him supposedly in order to resolve it.

17.     In May 2012, Mr. MacAllister informed Mr. O'Brien that Mr. MacAllister believed that Mr. O'Brien had a financial obligation toward himself as well as twenty-seven other kin.

18.     Mr. MacAllister has waged a campaign during 2012 of publicizing false statements about Mr. O'Brien in no fewer than seven written emails addressed to Irish, Burmese, and most recently Jamaican government officials and media that are clearly false and defamatory, in an attempt to disparage Mr. O'Brien and to damage the business of Mr. O'Brien and Digicel.  This malicious campaign intensified in August.

### *August/September 2012: Mr. MacAllister Makes False Statements to Journalists Concerning Mr. O'Brien*

19.     On August 9, 2012, Mr. MacAllister forwarded Mr. O'Brien an email sent to a Mr. Browne, on information and belief a well-known Irish print and broadcast journalist, host of the television show "Tonight with Vincent Browne"

6

and writer for the *Irish Times*.  In that email, Mr. MacAllister states that "100% of Mr. Obriens [sic] wealth and power appear to be based on criminal actions starting with those against my mother and myself which allowed him to acquire the assets which form the basis of his fortune.  Followed by his illegal payments to Mr. Lowry to secure the Irish Mobile License over honest competing bidders."  Mr. MacAllister also states in the email to Mr. Browne that he is "grateful for the recent process in our discussions with the forty odd jurisdictions who appear to have been victims of fraudulent acquisition of mobile licenses by Denis."

20.   On or around August 13 or 14, 2012, Mr. MacAllister forwarded Mr. O'Brien an email sent to a Mr. Martin, on information and belief the leader of the opposition Fianna Fail party in the Irish Parliament and Former Irish Minister for Foreign Affairs.  In that email, Mr. MacAllister notes that he looks forward to seeing Mr. O'Brien arrested and prosecuted "for his crimes against the Irish people," and for "deceiving approximately forty additional jurisdictions. . . as to the illicit source of the founding capital of Digicel, etc."

21.   On August 19, 2012, Mr. MacAllister forwarded Mr. O'Brien an email sent to a Ms. Harris, on information and belief the editor of *The Sunday Independent*, Ireland's largest newspaper by circulation.  In that email, Mr. MacAllister tells Ms. Harris that he looks "forward to working in concert with yourself. . . and the Attorneys General of Digicel's licensing jurisdictions, to bring an end to Denis Obriens [sic] crime spree against his relatives, the Irish People and affected telecom licensing jurisdictions worldwide."

22.   In support of his assertions about Mr. O'Brien, Mr. MacAllister cites a report written by Justice Michael Moriarty of Ireland, sitting as sole member of a

COMPLAINT

1   tribunal convened to examine the conduct of a former Irish Prime Minister (Mr.

2   Charles J. Haughey) and a former Government Minister (Mr. Michael Lowry)

3   during specified periods during their respective tenures in public office.

4        23.     As part of its Terms of Reference, this Tribunal inquired into the

5   circumstances surrounding the awarding of a license for a second mobile phone

6   service in Ireland in May 1996.  This licence was awarded to a consortium known

7   as Esat Digifone.  Mr. O'Brien was the Chairman of Esat Digifone at the time of

8   the awarding of the license.

9        24.     Despite the tribunal lasting from 1997 to 2011, on information and

10  belief no witness involved in conducting the process leading to the awarding of the

11  license for the second Irish mobile phone service stated that Mr. O'Brien engaged

12  in any corruption or wrongdoing in connection with the process.  Mr.

13  MacAllister's description of this report fails to acknowledge that the tribunal itself

14  was not a court proceeding and that the report of Mr. Justice Moriarty was "legally

15  sterile," with no evidentiary value in court proceedings, in the words of Ireland's

16  own Supreme Court.  Mr. MacAllister's deliberate mischaracterizations of Mr.

17  Justice Moriarty's report are designed to harm Mr. O'Brien.

18       25.     In addition, on July 7, 2012, the Supreme Court of Ireland issued a

19  ruling permitting a civil case in which Mr. O'Brien is named among the

20  defendants, *Comcast Int. Holdings v. Minister for Public Enterprise & Ors*, to

21  proceed.  The civil case, which had been filed in 2001 by persons and entities

22  associated with losing bidders for the mobile phone license that had been awarded

23  to Esat Digifone in 1996, was dismissed in 2007 by the Irish High Court for

24  "inordinate and inexcusable delay."  The Supreme Court of Ireland, in its ruling of

8

July 7, 2012 and written decisions published October 17, 2012, allowed the civil case to go forward notwithstanding the delay.  As with Mr. Justice Moriarty's report, Mr. MacAllister has mischaracterized the procedural ruling. He has taken a decision allowing a civil case to proceed and suggested that (a) it constitutes a substantive judgment of criminal conduct against Mr. O'Brien, (b) it allows a criminal trial to take place, and (c) it provides for that trial to take place before the Supreme Court of Ireland.  None of these things is true.  Again, Mr. MacAllister's deliberate mischaracterizations of the Supreme Court of Ireland's ruling are designed to harm Mr. O'Brien and Digicel.

### October/November 2012: Mr. MacAllister Makes False Statements Concerning Mr. O'Brien to Burmese and Jamaican Government Officials And Requests Money From Mr. O'Brien

26.     Apparently upset that his false allegations against Mr. O'Brien have not generated much press attention or caused Mr. O'Brien to agree to his demands for money, Mr. MacAllister in recent months plainly has escalated his effort to try to harm Mr. O'Brien and Mr. O'Brien's company, Digicel.  Mr. MacAllister has begun publicizing false allegations about them, targeting potential Digicel business partners at the same time that he encourages Mr. O'Brien to "settle" the disputes between Mr. MacAllister and Mr. O'Brien.  Mr. MacAllister has volunteered to Mr. O'Brien that he has contacted parties in approximately 40 jurisdictions in which Digicel or other companies associated with Mr. O'Brien have or have had telecommunications licenses, and Mr. MacAllister has stated that he is working to have those licenses seized.

27.     Mr. MacAllister recently has focused his dissemination of false and malicious statements on a significant business opportunity Digicel and Mr.

9

1   O'Brien currently are pursuing in Burma, which has the potential to double

2   Digicel's existing customer base.  Burma, a nation of 60 million people, is reported

3   to have the second-lowest mobile phone penetration in the world; less than two

4   percent of Burmese residents are reported to have access to mobile telecom

5   services.  The Burmese government is currently preparing, for the first time, to

6   award mobile telecom licenses to foreign companies via a competitive tender

7   process.  Digicel has publicly committed in excess of $1 billion to expand and

8   improve Burma's mobile telecom systems if the company were to be awarded such

9   a license.

10         28.   With full knowledge that Digicel is preparing to submit a tender offer

11   for a mobile phone license in Burma, Mr. MacAllister has directly and repeatedly

12   emailed officials of the Burmese government, as well as Senior Ministers of the

13   Irish government and Burmese and Irish media, to encourage them to reject any

14   Digicel license application, all with the intent of maliciously harming Mr. O'Brien

15   and Digicel and increasing the strength of his hand in any future "settlement"

16   negotiations with Mr. O'Brien.

17         29.   In an October 17, 2012 email addressed to Daw Aung San Suu Kyi, a

18   member of the Burmese parliament and Chairperson of the opposition National

19   League for Democracy party, and apparently also sent to the office of the President

20   of Myanmar (Burma) and the official email address of the government-controlled

21   postal and telecommunications systems, Mr. MacAllister stated:

22         A.   "Please allow competing bidders to comment on the fairness of

23   allowing a individual who is currently facing the negative findings of Irelands most

24   senior Judge regarding 'Denis Obrien making illegal payments to politicians to

COMPLAINT

secure Irelands Mobile License.'" This statement creates the misleading impression that an Irish court has found Mr. O'Brien guilty of a criminal charge. Mr. O'Brien is not and has never faced or been found guilty of a criminal charge.

30. On October 20, 2012, in terms that had become increasingly bizarre, Mr. MacAllister demanded that Mr. O'Brien "announce Monday morning in front of Dublin Castle," that Mr. O'Brien had "made a grave mistake against the People and Nation of Ireland," and that Mr. O'Brien should announce that he had instructed his attorney to "immediately contact my relative Don MacAllister and offer restitution for the damages and devastation my actions have wrought upon their lives. And agree to immediately settle the pending lawsuit in Bermuda brought by my relative Don MacAllister."

31. In an October 23, 2012 email apparently sent to members of the Burmese media, and copying two Irish journalists, an Irish government minister and an Irish Senator, Mr. MacAllister stated:

A. "Irelands [sic] Supreme Court has now placed Burma telecom license applicant Denis Obrien [sic] on trial for Criminal Bribery and Corruption." This statement is false. Mr. O'Brien is not and has never been on trial for any criminal charge, much less a criminal charge being heard by the Supreme Court of Ireland.

B. "It is also illegal under International Law for a [sic] individual who is on trial for Criminal Bribery and Corruption in one Nation to participate in a Telecom License competition in a second Nation at the same time." This statement suggests that Mr. O'Brien is on trial facing a criminal charge, which he is not and has never been. Accordingly, the statement is false.

11

32.     On October 27, 2012, despite taking no additional action in the Bermuda litigation since its filing, Mr. MacAllister sent an email directly to Mr. O'Brien, requesting that Mr. O'Brien "offer a settlement amount to settle the lawsuit I have filed against you in Bermuda" and to resolve other grievances that Mr. MacAllister has raised with Mr. O'Brien.  Mr. MacAllister apparently forwarded as part of that email an October 26 email sent to Daw Aung San Suu Kyi, the aforementioned member of the Burmese parliament and Chairperson of the opposition National League for Democracy party, and forwarded to an Irish government minister, an Irish Senator, an Irish journalist and an American journalist.  In that email, Mr. MacAllister stated:

A.     "Please consider requesting withdrawal of Denis Obrien's application for a telecom license in Myanmar while Denis Obrien is on trial for Criminal Bribery and Corruption in Ireland, before Ireland's Supreme Court." This statement is false.  Mr. O'Brien is not and has never been on trial for any criminal charge, much less a criminal charge being heard by the Supreme Court of Ireland.

33.     In a November 1, 2012 email sent to Mr. O'Brien and apparently copying, on information and belief, an Irish government minister and an Irish Senator, Daw Aung San Suu Kyi, a U.S. State Department employee, and members of the Irish and American media, Mr. MacAllister stated:

A.     "I will now prepare to send a letter to the US Congress, the US Senate and the US President informing them the largest contributor to the Clinton Foundation who is now on trial for Criminal Bribery and Corruption before Irelands [sic] Supreme Court has apparently asked US Secretary of State Clinton to

12

COMPLAINT

1  NOT report to Myanmar Law Enforcement and Authorities that the largest

2  contributor to her husbands [sic] Foundation is apparently attempting to apply for a

3  Telecom License in Myanmar while on trial for Criminal Bribery and Corruption

4  before Irelands [sic] Supreme Court." This statement is false. Mr. O'Brien is not

5  and has never been on trial facing a criminal charge, much less a criminal charge

6  being heard by the Supreme Court of Ireland.

7          B.    "It is a crime to apply for a Telecom License in Myanmar at the

8  same time as you are on Trial for Criminal Bribery and Corruption before Irelands

9  [sic] Supreme Court. Especially without providing 'full and accurate disclosure'

10  of the fact you (and not your competing bidders) have been placed on criminal trial

11  before Irelands [sic] Supreme Court . . ." Again, this statement suggests that Mr.

12  O'Brien is on trial facing a criminal charge, which he is not and has never been.

13  The statement further suggests that Mr. O'Brien is being tried before the Supreme

14  Court of Ireland, which he is not. Accordingly, the statement is false.

15        34.    On November 6, 2012, after receiving a letter from U.S. counsel to

16  Mr. O'Brien directing Mr. MacAllister to cease and desist from disseminating false

17  statements to third parties, Mr. MacAllister responded to assert in conclusory

18  fashion that his statements had not been false but once again proposed a

19  "settlement" with Mr. O'Brien regarding "all disputes between us."

20        35.    The following day, November 7, 2012, Mr. MacAllister sent an email

21  to, on information and belief, two members of the Burmese state-owned telecom

22  authority, copying Daw Aung San Suu Kyi, two members of the U.S. State

23  Department, an Irish government minister, an Irish Senator, and members of the

24  Irish and American media. In that email, Mr. MacAllister stated:

13

A.      "Please consider requesting withdrawal of the Application by Denis Obrien for a telecom License in Myanmar following the Oct. 18th ruling by Irelands Supreme Court that Denis Obrien be placed on trial for corruption and bribery charges which Irelands Mr. Justice Hardiman said represent "... BOTH a civil wrong and a CRIMINAL offense."  This statement suggests that a Justice on the Supreme Court of Ireland has concluded that Mr. O'Brien engaged in criminal conduct.  This is false.  Mr. O'Brien has never faced or been found guilty of a criminal charge, by the Supreme Court of Ireland or otherwise.  Indeed, in a brazen act of malicious deception, Mr. MacAllister excised from the quoted material the critical phrase: "*if* proven" (emphasis in original), thus falsely converting an allegation into a supposed conclusion.  The statement is patently false.

36.      Also on November 6, after receiving a letter from Irish counsel to Mr. O'Brien similarly directing him to cease and desist from disseminating false statements to third parties, Mr. MacAllister likewise responded to assert that his statements had not been false and yet again proposed a "settlement" with Mr. O'Brien regarding disputes between them.  Thirty-six hours later, in an email sent to a government official in Jamaica, which is Digicel's largest market and where the Digicel Group has its international headquarters, and copying, on information and belief, members of the Burmese state-owned telecom authority, Daw Aung San Suu Kyi, two U.S. State Department employees, an Irish government minister, an Irish Senator, an Irish journalist and an American journalist, MacAllister stated:

A.      "Please consider following the lead of Irelands Taoiseach and calling for Jamaica to accept 'in their entirety' the adverse findings against Denis Obrien by Irelands Sole Justice Michael Moriarty on March 22, 2011. And calling

for Jamaica to accept the unanimous ruling against Denis Obrien on October 18th by Irelands [sic] Supreme Court. And review the legality and appropriateness of Jamaica continuing to permit Denis Obrien [sic] to be entrusted with Jamaica's telecom license while he is on trial for charges Irelands [sic] Mr. Justice Hardiman said represent '...BOTH a civil wrong and a CRIMINAL offense.'" As noted above concerning the similar statement sent by Mr. MacAllister on November 7, 2012, this statement suggests that a Justice on the Supreme Court of Ireland has concluded that Mr. O'Brien engaged in criminal conduct. This is false. Mr. O'Brien has never faced or been found guilty of a criminal charge, by the Supreme Court of Ireland or otherwise. Again, Mr. MacAllister has deceptively excised from the quoted material the critical phrase: "*if* proven" (emphasis in original), thus falsely converting an allegation into a supposed conclusion by a Justice on the Supreme Court of Ireland.

37.    Regardless of Mr. MacAllister's difficult youth and the untimely death of his mother, Mr. O'Brien and Digicel cannot allow him to harm their interests by continuing to publicize false statements.

## FIRST CAUSE OF ACTION
### (Libel Per Se - O'Brien)

38.    Mr. O'Brien restates and re-alleges the allegations set forth in paragraphs 1 through 37 above and incorporates them by reference.

39.    On November 1, 2012, Mr. MacAllister sent an email to Mr. O'Brien, apparently copying an Irish government minister and an Irish Senator, a U.S. State Department employee, and members of the Irish and American media.

15

COMPLAINT

40.     In that email, Mr. MacAllister stated "It is a crime to apply for a Telecom License in Myanmar at the same time as you are on Trial for Criminal Bribery and Corruption before Irelands [sic] Supreme Court."

41.     This statement is false.  Mr. O'Brien is not and has never been on trial for any criminal charge in any jurisdiction, much less a criminal trial before the Supreme Court of Ireland.

42.     The email permitted its recipients to reasonably understand that the statements referred to Mr. O'Brien, because he was identified by name.

43.     The email permitted its recipients to reasonably understand that the statements connected Mr. O'Brien to a crime, because the email states that Mr. O'Brien is facing a criminal trial, and that he is committing a further criminal act by applying for the mobile license.

44.     Mr. MacAllister published this false and defamatory statement either knowing that the statement was false, or having serious doubts about its truth.

45.     Mr. O'Brien is entitled to general damages for harm to his property, business, trade, profession, or occupation, expenses, harm to his reputation, and shame, mortification, or hurt feelings caused by the defamatory statements in accordance with proof at trial.

46.     Mr. MacAllister acted with reckless, willful or callous disregard for Mr. O'Brien's rights and with malice, fraud or oppression, entitling Mr. O'Brien to an award of punitive damages in accordance with proof at trial.

COMPLAINT

## SECOND CAUSE OF ACTION
### (Libel Per Se - O'Brien)

47.    Mr. O'Brien restates and re-alleges the allegations set forth in paragraphs 1 through 37 above and incorporates them by reference.

48.    On October 27, 2012, Mr. MacAllister apparently sent an email to, on information and belief, an Irish government minister, an Irish Senator, an Irish journalist and an American journalist, forwarding an email he had apparently sent on October 26, 2012 to Daw Aung San Suu Kyi.

49.    In that email, Mr. MacAllister stated "Please consider requesting withdrawal of Denis Obrien's application for a telecom license in Myanmar while Denis Obrien is on trial for Criminal Bribery and Corruption in Ireland, before Ireland's Supreme Court."

50.    This statement is false.  Mr. O'Brien is not and has never been on trial for any criminal charge, much less a criminal charge being heard by the Supreme Court of Ireland.

51.    The email permitted its recipients to reasonably understand that the statement referred to Mr. O'Brien, because he was identified by name.

52.    The email permitted its recipients to reasonably understand that the statements connected Mr. O'Brien to a crime, because the email states that Mr. O'Brien is facing a criminal trial, and is on trial before the Supreme Court of Ireland.

53.    Mr. MacAllister published this false and defamatory statement either knowing that the statement was false, or having serious doubts about its truth.

COMPLAINT

54.    Mr. O'Brien is entitled to general damages for harm to his property, business, trade, profession, or occupation, expenses, harm to his reputation, and shame, mortification, or hurt feelings caused by the defamatory statement in accordance with proof at trial.

55.    Mr. MacAllister acted with reckless, willful or callous disregard for Mr. O'Brien's rights and with malice, fraud or oppression, entitling Mr. O'Brien to an award of punitive damages in accordance with proof at trial.

### THIRD CAUSE OF ACTION
**(Libel Per Se - O'Brien)**

56.    Mr. O'Brien restates and re-alleges the allegations set forth in paragraphs 1 through 37 above and incorporates them by reference.

57.    On October 23, 2012, Mr. MacAllister sent an email to members of the Burmese media, copying two Irish journalists, an Irish government minister and an Irish Senator.

58.    In that email, Mr. MacAllister stated that "Irelands [sic] Supreme Court has now placed Burma telecom license applicant Denis Obrien [sic] on trial for Criminal Bribery and Corruption."

59.    This statement is false.  Mr. O'Brien is not and has never been on trial for any criminal charge in any jurisdiction, much less a criminal trial before the Supreme Court of Ireland.

60.    In that email, Mr. MacAllister also stated "It is also illegal under International Law for a [sic] individual who is on trial for Criminal Bribery and Corruption in one Nation to participate in a Telecom License competition in a second Nation at the same time."

COMPLAINT

61.     This statement suggests that Mr. O'Brien is facing a criminal trial, which he is not and has never been.  Accordingly, the statement is false.

62.     The email permitted its recipients to reasonably understand that the statements referred to Mr. O'Brien, because he was identified by name.

63.     The email permitted its recipients to reasonably understand that the statements connected Mr. O'Brien to a crime, because the email states that Mr. O'Brien is facing a criminal trial, and that he is committing a further criminal act by applying for the mobile license.

64.     Mr. MacAllister published these false and defamatory statements either knowing that the statements were false, or having serious doubts about their truth.

65.     Mr. O'Brien is entitled to general damages for harm to his property, business, trade, profession, or occupation, expenses, harm to his reputation, and shame, mortification, or hurt feelings caused by the defamatory statements in accordance with proof at trial.

66.     Mr. MacAllister acted with reckless, willful or callous disregard for Mr. O'Brien's rights and with malice, fraud or oppression, entitling Mr. O'Brien to an award of punitive damages in accordance with proof at trial.

## FOURTH CAUSE OF ACTION
**(False Light (Invasion of Privacy) – O'Brien)**

67.     Mr. O'Brien restates and re-alleges the allegations set forth in paragraphs 1 through 37 above and incorporates them by reference.

68.     In his emails sent on October 17, 2012, October 23, 2012, October 27, 2012, and November 1, 2012, Mr. MacAllister published false statements either

COMPLAINT

1    that Mr. O'Brien is facing a criminal trial before the Supreme Court of Ireland or

2    that the Supreme Court of Ireland has ruled that Mr. O'Brien be placed on trial for

3    criminal charges.

4          69.    The October 17, 2012 email was sent to seven separate email

5    addresses.

6          70.    The October 23, 2012 email was sent to five separate email addresses.

7          71.    The October 27, 2012 email was sent to five separate email addresses.

8          72.    The November 1, 2012 email was sent to eight separate email

9    addresses.

10         73.    By publishing false statements that Mr. O'Brien is on trial for criminal

11   bribery and that he is on trial before the Supreme Court of Ireland, Mr. MacAllister

12   placed Mr. O'Brien into a false light that is highly offensive to reasonable people.

13         74.    When Mr. MacAllister published these false statements, he either

14   knew that the statements were false and would place Mr. O'Brien into a false light,

15   or had serious doubts about their truth and their effect of placing Mr. O'Brien into

16   a false light.

17

18

19

20

21

22

23

24

COMPLAINT

### FIFTH CAUSE OF ACTION
#### (Civil Extortion – O'Brien)

75.     Mr. O'Brien restates and re-alleges the allegations set forth in paragraphs 1 through 37 above and incorporates them by reference.

76.     Beginning no later than 2011, Mr. MacAllister has waged a long campaign of publicizing false statements about Mr. O'Brien in an attempt to disparage Mr. O'Brien and to damage the business of Mr. O'Brien and Digicel, and to make clear to Mr. O'Brien that the conduct will continue absent the payment of money to Mr. MacAllister.  In the course of this protracted campaign, Mr. MacAllister has affirmatively indicated to Mr. O'Brien and to others that he has been in contact with individuals in approximately 40 different markets where Mr. O'Brien has business interests about the subject of Mr. O'Brien's interests, including the potential seizure of mobile licenses held by Digicel.

77.     By coupling demands for money with evidence of statements that Mr. MacAllister already had sent to individuals with direct responsibility for Digicel's business—statements that falsely assert that Mr. O'Brien is facing a criminal trial in the Supreme Court of Ireland and has been found to have engaged in criminal conduct by a Justice on the Supreme Court of Ireland—Mr.  MacAllister has impliedly threatened Mr. O'Brien that he will continue to spread lies about Mr. O'Brien and to impute criminal conduct to him unless Mr. O'Brien pays him.

78.     On October 27, 2012 and November 6-8, 2012, Mr. MacAllister sent emails to Mr. O'Brien with the intent to use fear to induce Mr. O'Brien to pay Mr. MacAllister money.

21

79.     As set forth above, the October 27, 2012 email is not Mr.

MacAllister's first demand that Mr. O'Brien pay him money.  In December 2009,

Mr. MacAllister sought a below-market loan of $27,000,000.00 from Mr. O'Brien.

In the cover letter to Mr. O'Brien, Mr. MacAllister stated "After many troubled

years, I believe that your agreement to the attached loan is the least I deserve for

the price I paid to make you successful.  I feel my late mother would certainly

agree."

80.     In 2011, Mr. MacAllister made a further demand for money from Mr.

O'Brien by bringing suit in Bermuda, seeking the return with interest of a

purported (and non-existent) second investment of $100,000.00 that Mr.

MacAllister claimed to have made in Digicel in 2003.

81.     In May 2012, Mr. MacAllister informed Mr. O'Brien that Mr.

MacAllister believed that Mr. O'Brien had a financial obligation toward himself

and approximately twenty-seven other family members.  In his 2011 book, Mr.

MacAllister indicated that he believed that €108,900,000.00 should be "bestowed"

on the MacAllister family primarily by Mr. O'Brien.  This is despite the fact that

Mr. O'Brien had already provided significant financial support to Mr. MacAllister

and his siblings over an extended period.  Mr. O'Brien continues to provide

significant financial support on a monthly basis to the extended MacAllister

family.

82.     In August 2012, Mr. MacAllister informed Mr. O'Brien that he had by

that point been in contact with "forty odd jurisdictions" from which Mr. O'Brien or

Digicel had obtained "mobile licenses," and that he was working to have those

licenses seized.

COMPLAINT

83.    On October 20, 2012, Mr. MacAllister demanded that Mr. O'Brien announce publicly that he would "offer restitution for the damages and devastation my actions have wrought upon [Mr. MacAllister and his family's] lives.  And agree to immediately settle the pending lawsuit in Bermuda brought by my relative Don MacAllister."  This is the same lawsuit that Mr. MacAllister has never made any attempt to prosecute.

84.    The above-referenced October 27, 2012 email represents a further attempt by Mr. MacAllister to demand additional money from Mr. O'Brien.  In the email, Mr. MacAllister requested that Mr. O'Brien "offer a settlement amount to settle the lawsuit I have filed against you in Bermuda.  And to settle your exploitation of the wrongful killing of my mother to gain the basis for your fortune."

85.    As part of the October 27, 2012 email, Mr. MacAllister included some of the emails he has sent to third parties that contain false statements.  For example, Mr. MacAllister included an October 26, 2012 email that Defendant sent to Burmese parliament member Daw Aung San Suu Kyi, where he requests withdrawal of Digicel's mobile license application in Burma "while Denis Obrien [sic] is on trial for Criminal Bribery and Corruption in Ireland."

86.    Mr. MacAllister also included a copy of an October 25, 2012 email that Mr. MacAllister sent to a "Juma" at a state.gov email address, where he states he has "received information a crime is possibly being committed at this time against the People of Myanmar (Burma), and states that Mr. O'Brien "is now being placed on trial in Ireland for Criminal Bribery and Corruption of Ireland's Telecom Minister."

COMPLAINT

87.     Most recently, on November 7, 2012, one day after Mr. MacAllister again proposed a "settlement" with Mr. O'Brien to Mr. O'Brien's U.S. counsel, Mr. MacAllister sent an email apparently to, on information and belief, two members of the Burmese state-owned telecom authority, copying Daw Aung San Suu Kyi in Burma, two members of the U.S. State Department, an Irish government minister, an Irish Senator, and members of the Irish and American media.  Mr. MacAllister also copied Mr. O'Brien on that email.  In the email, Mr. MacAllister asks the Burmese telecom authority to consider requesting withdrawal of Mr. O'Brien and Digicel's application for a telecom license, "following the Oct. 18th ruling by Irelands [sic] Supreme Court that Denis Obrien [sic] be placed on trial for corruption and bribery charges which Irelands [sic] Mr. Justice Hardiman said represent '... BOTH a civil wrong and a CRIMINAL offense,'" having excised the key "*if* proved" phrase from Justice Hardiman's statement.

88.     The following day, approximately thirty-six hours after Mr. MacAllister had last proposed a "settlement" with Mr. O'Brien, Mr. MacAllister sent an additional email to, on information and belief, a government official in Jamaica, Digicel's largest market, copying Daw Aung San Suu Kyi, two members of the U.S. State Department, an Irish government minister, an Irish Senator, members of the Irish and American media, and Mr. O'Brien himself.  In similar language to that used in his November 7, 2012 email, Mr. MacAllister asks the Jamaican government official to consider reviewing "the legality and appropriateness of Jamaica continuing to permit Denis Obrien [sic] to be entrusted with Jamaica's telecom license while he is on trial for charges Irelands [sic] Mr. Justice Hardiman said represent '...BOTH a civil wrong and a CRIMINAL

24

COMPLAINT

1 offense,'" once again having excised the key "*if* proved" phrase from Justice

2 Hardiman's statement.

3      89.    The pattern of behavior engaged in by Mr. MacAllister, pairing false

4 statements about Mr. O'Brien's supposed criminal culpability and criminal trial

5 with requests to Mr. O'Brien for money, impliedly seek to coerce Mr. O'Brien into

6 paying Mr. MacAllister.

7                                     **SIXTH CAUSE OF ACTION**
**(Intentional Interference with Prospective Economic Advantage - Digicel)**

8

9      90.    Digicel restates and re-alleges the allegations set forth in paragraphs 1

10 through 89 above and incorporates them by reference.

11      91.    Digicel has an existing prospective business relationship with the

12 country of Burma. Digicel has presented a technical and commercial assessment

13 of the process for expanding Burma's existing telecom network to the Burmese

14 government, and is now preparing to engage in a tender process for a mobile

15 telecom license. Digicel has already made substantial investments to further its

16 expected business relations with the country of Burma, including providing multi-

17 year sponsorships to Burmese sports associations, and is prepared to make an

18 initial investment of in excess of $1 billion to improve Burma's telecom

19 infrastructure. These efforts have resulted in brand awareness within Burma.

20 Digicel is well-positioned as a competitive candidate for a telecom license.

21      92.    There is a significant probability of future economic benefit from a

22 business relationship between Digicel and Burma because the potential mobile

23 telecom market in Burma is extremely large. Burma has 60 million residents, less

24 than two percent of whom are reported to currently have access to mobile phone

COMPLAINT

and Internet services.  Neighboring countries have usage rates varying from 57 to 100 percent, suggesting that a telecom license in Burma could result in Digicel's acquiring tens of millions of new customers and potentially doubling the size of its worldwide customer base.

93.    Mr. MacAllister is improperly interfering with Digicel and Burma's prospective business relationship by sending emails to Burmese government officials falsely stating that Mr. O'Brien is on criminal trial before and that he has been found by at least one Justice to have engaged in criminal conduct.  Moreover, Mr. MacAllister has requested assistance from the U.S. Department of State in alerting Burmese government officials, falsely stating that Mr. O'Brien has been placed on criminal trial in Ireland.

94.    These false statements are intentionally designed to disrupt the prospective business relationship by damaging the reputation of Mr. O'Brien and Digicel at the time the government of Burma is preparing to consider a tender offer by Digicel for a mobile telecom license.

95.    Mr. MacAllister's false statements are independently wrongful because they constitute libel.

96.    Mr. MacAllister made the false statements with the intent to disrupt the business relationship between Digicel and Burma.

97.    It is foreseeable that making inflammatory statements falsely accusing Mr. O'Brien of facing a criminal trial would result in harm to Digicel.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

98.    General damages in an amount to be proven at trial;

26

1    99.    Punitive damages;

2    100.    Injunctive relief, preventing Mr. MacAllister from repeating the

3    aforementioned falsehoods about Mr. O'Brien, and preventing Mr. MacAllister

4    from attempting to extort money from Mr. O'Brien;

5    101.    Awarding Plaintiffs the costs of this action, including reasonable

6    attorneys' fees; and

7    102.    Granting such other relief as this Court may deem just and proper.

8    Dated:  November 8, 2012                  Respectfully submitted,
                                               DAVIS POLK & WARDWELL LLP
9

10                                             By: _____

11                                             Neal A. Potischman (SBN 254862)
                                               Brooke Pyo (SBN 282326)
12                                             1600 El Camino Real
                                               Menlo Park, California 94025
13                                             Telephone: (650) 752-2000
                                               Facsimile:  (650) 752-2111
14                                             neal.potischman@davispolk.com
                                               brooke.pyo@davispolk.com
15
                                               Lawrence Portnoy
16                                             (*pro hac vice application forthcoming*)
                                               Julia Kiechel
17                                             (*pro hac vice application forthcoming*)
                                               DAVIS POLK & WARDWELL LLP
18                                             450 Lexington Avenue
                                               New York, New York 10017
19                                             Telephone: (212) 450-4000
                                               Facsimile:  (212) 701-5800
20                                             lawrence.portnoy@davispolk.com
                                               julia.kiechel@davispolk.com
21
                                               *Attorneys for Plaintiffs Denis O'Brien*
22                                             *and Digicel Group Ltd*

23

24

                                    27

COMPLAINT